Kenneth GRANVIEL, Appellant,

v.

The STATE of Texas, Appellee.

No. 69177.

Court of Criminal Appeals of Texas,
En Banc.

July 2, 1986.

Lee Ann Dauphinot, Danny D. Burns, Fort Worth, for appellant.

Tim Curry, Dist. Atty., and C. Chris Marshall, David L. Richards and Greg Pipes, Asst. Dist. Attys., Fort Worth, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

TOM G. DAVIS, Judge.

Appeal is taken from a conviction for capital murder. V.T.C.A. Penal Code, Sec. 19.03(a)(2). After finding appellant guilty, the jury returned affirmative findings to the special issues under Art. 37.071(b), V.A. C.C.P. Punishment was assessed at death.

■ Appellant contends that the evidence is insufficient to prove the aggravating offense of aggravated rape. Appellant argues as follows:

"The only evidence of the circumstances of the sexual intercourse was Appellant's statement. According to the statement, the intercourse was consensual and the murder came later. Since the State offered the statement which admitted guilt but contained exculpatory statements, it was bound to disprove the exculpatory portions which would change the offense from capital murder to murder. *Palafox v. State*, 608 S.W.2d 177 (Tex.Cr.App. 1980). The State, therefore, did not sustain the burden of proving aggravated rape as set out in Sec. 21.02 and 21.03 of Tex.Penal Code and reversal is required."

We have set out appellant's confession in the footnote.[1] Appellant claims that his

1. "... I went and got in my blue olds 88 and drove around the McClendons apartment. I knew all of the McClendon girls.... While I was driving around the block I got this urge to have sex with Laura McClendon. I haven't even had sex with her before. I stopped and backed my car up to their apartment. I sit there in the car a few minutes. They had the living room curtains open and I could see Laura inside. I don't remember what time it was but it was sometime around 10:00 P.M. I went to the apartment and the front door was open. I stuck my head inside and knocked. Then Laura come around the corner from the kitchen and said 'Come on in,'. I sit down on the couch. We exchanged a few words and then I asked her for a drink of water. By then all I wanted to do was drink the water and leave, but I didn't. I took the glass back in the kitchen. She was wiping off the stove and the little boy, Steven was over by the kitchen table playing. I had a bone handle stake knife with me. I had brought the knife with me. I walked up behind Laura while she was cleaning the stove and put the knife to her throat. She laughed and thought I was playing. I told her to turn around that I wasn't kidding. I told her to smile and to put her arms around me so little Steven wouldn't get frightened. Then I told her to get Steven's hand and we started walking to her bedroom. It is the first bedroom in the right. I told her and Steven to stop right there and I went and locked the front door and closed the curtains. *That is when Laura told me I didn't have to take it, she meant rape her.* I put the knife in my back pocket and we went into her bedroom. Steven was still with us. I told Laura that I would have to tie Steven up because he sensed something was wrong and started crying. Then I pulled the phone cord from the phone. I gave it to Laura and told her to tie him up. She tied Steven up and I think she tied his hands behind him. I told her to put him in the closet but she didn't, she sit him on the bed. Then I tied her up. It took the sheet off of Laura's bed and I cut and tore a piece off of the sheet and tied Laura up and gagged her. Then I layed both of them face down on the bed. That when Linda, Motasha and Martha McClendon came in. I was still in Laura's bedroom when they came in. I stood up beside the closet and the door to the bedroom was shut. I heard Martha say 'Where is Laura?' By then Matasha came in the room. I just made a move and she saw me and she ran back out of the room. At that time Martha went into the bathroom. Matasha didn't say anything, she just ran into the bathroom with Martha. I took the bedspread and threw it over Laura and Steven then Linda came into the room. I moved back beside the closet and when Linda came in the bedroom I showed her the knife and told her to lay down beside Laura. Then I shut the door. By then Martha came out of the bathroom and went to the living room. I can't remember where Matasha was at that time. I walked in the living room and Martha was looking out the window. Then she closed the curtain. I walked up behind her and grabbed her and threw her on her head and she asked me what was wrong. I told her to get up and I put the knife to her throat and took her to her bedroom. That is the back bedroom. I think I used her sheet off her bed to tie her up with. I drug her back into the front bedroom where Linda and Laura was. Matasha was already in there too. I tied up Matasha but I can't remember what with. After I tied them all up and gagged them all and I left went outside and got in my car. I moved my car around the street by the pool and backed it in. I got out and walked back through the opening to their apartment. I went back in the apartment. I went back to Laura's bedroom and all five of them were still in the room. I took Laura to the back bedroom and pulled her pants down to her ankles and I got a little excited and I took the knife and when I started to cut the panties off the knife went in and cut her in the inside the thigh. I don't remember if I cut the panties off or pulled them down. Then little Steven started crying and I went and put him on a trunk in the closet of Laura's room. I went back in the back bedroom with Laura and she kept trying to mumble something. I went ahead and took the gag off Laura and she told me that she and Steven had asthma and there was some medicine on the dresser. I went and got it and gave it to her and took her in to where Steven

statement "that is when Laura told me I didn't have to take it, she meant rape her and I put the knife back in my pocket and we went into her bedroom", is exculpatory, in that it negates lack of consent to the intercourse. If Laura McClendon did speak the words appellant claims she did, and with the purpose appellant attributes to them, appellant's confession shows that she spoke them early in her encounter with appellant, and not at the time of the intercourse. Many events intervened between her remark and the intercourse. Concerning the intercourse, appellant states, "I took Laura back in the back room. *I raped her* then we sit there and talked for about an hour." [our emphasis.]

The confession contains no exculpatory matter. At the point when consent is an issue, that is, at the time of the intercourse, appellant's confession states that he raped the victim; in other words, that the intercourse was without the victim's consent. The rule of *Palafox* therefore does not apply. Ground of error number thirteen is overruled.

■ In his fifth ground of error appellant contends that the trial court erred in admitting his confession over objection that it was obtained in violation of appellant's right to counsel. The record reflects that the trial court held a *Jackson v. Denno* hearing on the voluntariness of the confession. The trial court found that the confession was made voluntarily, and that appellant had waived his right to counsel. The court overruled the objection.

The record of the hearing reflects that on the night of February 8, 1975, at 10:11 p.m., appellant went to the Fort Worth police station, accompanied by a Rev. Spearman. Officer Raulston testified that he was on duty that night. Raulston testified that the two men came into the station together, and that Rev. Spearman introduced appellant to Raulston. Appellant

stated that he wanted to talk to a homicide investigator. Raulston told appellant that he was one, and appellant "asked if there was someplace that we could talk privately." Raulston then escorted the two men to an office in the homicide section and closed the door.

Raulston testified to the sequel as follows:

"A. Reverend Spearman sat down at the table; Kenneth advised me, he says, you better sit down, I'm going to give you the shock of your life; and I asked him, I said, I don't understand what you're talking about, and he reached into his pocket and removed a pistol and laid it on the table, and then he reached in his pocket and pulled out a butcher knife and laid it on the table, and then he says, now do you understand what I'm talking about, and I said, not really; it's beginning to be a little clearer.

"Q. Let me ask you this: Was it in fact becoming clearer to you? Did you have any idea what this was about?

"A. My idea at that time was that some sort of violence had occurred. He said then that he wanted to confess to the Riverside Village Apartment murders."

Raulston testified that appellant stated at this point that he also wanted to confess "to two more that he had done that night." The Riverside Village Apartments was the site of the five murders appellant had committed the previous October (including the one for which he was convicted in the instant case). Raulston testified that he was familiar with that incident, and knew then what appellant was talking about. Raulston testified that "as soon as he told us that he had wanted to confess to the Riverside Village plus two that occurred that night, I then read him the blue card and then's when we started talking about it."

was. By this time Steven got loose, the gag was off his hands was loose. He was sitting there crying. I tied him back up and gagged him again, but I can't remember what I used. *I took Laura back in the back room. I raped*

*her then we sit there and talked for about an hour....*" [The confession goes on to recount appellant's murder of Laura, Linda, Martha, Steven and Natasha McClendon.] [emphasis ours.]

Raulston gave appellant the warnings prescribed by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and also warned him of his right to terminate the interview at any time under Art. 38.22, V.A.C.C.P. In connection with this, Raulston was asked:

> "Q. Okay. Let me ask you specifically if you informed the defendant of the charge that—that he might be facing in this case?
>
> "A. He advised us that he was guilty of the murders that occurred."

Raulston testified that after reading the warnings to appellant, he asked him "if there was any questions or requests concerning the warning and he advised that he had no requests or questions about it; that he fully understood it."

Raulston was concerned that one or both of that night's victims might still be alive. Raulston asked if appellant would take the police back to the site of that night's murders, and appellant replied that he would. Two more officers and an assistant district attorney joined Raulston to help with the investigation. When appellant was introduced to the assistant district attorney, appellant said that he did not want any publicity. When the assistant district attorney told him that he could not make any promises, appellant turned to him and said, "well, I don't want you posing with me and saying that you solved this crime, because I came to you." Appellant, Raulston, and the other three then drove to the murder scene, leaving Rev. Spearman at the police station.

The assistant district attorney, Rufus Adcock, also testified at the *Jackson v. Denno* hearing. Adcock testified that when the group arrived at the apartment building to which appellant had directed them, he said to appellant, "Mr. Granviel, do you understand you have a Constitutional right to refuse us the right of entry into your home or search it for any reason whatsoever", and that appellant said yes. Adcock then asked if appellant waived the right. Adcock testified that appellant re-

sponded, "I came to you and I'm taking you to them."

Appellant gave the police a key. Raulston and Detective Hudson entered and found two dead women inside the apartment. The Crime Scene Search Unit and the Medical Examiner were summoned. After handing the investigation of the scene over to them, the officers took appellant back to the police station.

When the group returned to the police station, Detective Hudson again warned appellant of his rights, and asked appellant if he wanted to give a statement about the Riverside Village murders. Appellant replied that he did, and began at 1:09 a.m. to give a statement to Detective Hudson. The record reflects that Hudson took down the statement in longhand, and then gave his transcription to a typist to be typed.

At 2:40 a.m., appellant had finished his first statement, concerning the Riverside Village murders. As Raulston prepared to take down the second, concerning the murders appellant had committed that night, appellant told Raulston that "he had a legal question that he would like to ask." Raulston went to Adcock. Adcock came into the room and asked appellant if he could answer the question for him. Appellant replied no, he didn't think so. Adcock then motioned toward a telephone in the room and told appellant "to call whoever he liked". Appellant "then said something and looked at [Adcock]—pertaining to an automobile title and his car." Adcock further testified as follows:

> "A. Because when he said that, I'm sure I looked at him like here we are right in the middle of this, or something. He just said it really doesn't matter and took his arm and moved the telephone and phone book back and said, I'll sign the statement.
>
> "Q. What, if anything, did you do? Did you have any other conversation with him at that time?
>
> "A. No. I went to Mr. Raulston and told him to warn him again of his Constitutional rights."

Raulston then began taking appellant's statement concerning that night's murders. Appellant signed both statements in their typewritten form. Both were introduced at trial.

Appellant contends that his expression of the desire to ask a legal question constituted an invocation of the right to counsel. The Fifth Amendment right to counsel is a product of the *Miranda* decision:

"... the right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege under the system we delineate today.

"...

"Accordingly we hold that an individual held for interrogation must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during the interrogation under the system for protecting the privilege we delineate today."

*Miranda* applies, however, to statements stemming from custodial interrogation only:

"... briefly stated [our holding] is this: the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."

The Fifth Amendment right to counsel fashioned by *Miranda* was not triggered in the instant case. In express terms, *Miranda* excludes from its scope volunteered confessions such as appellant's:

"In dealing with statements obtained through interrogation, we do not purport to find all confessions inadmissible. Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. *The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and of counsel, but whether he can be interrogated. There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.*" [our emphasis.]

The *Miranda* opinion distinguishes clearly between "statements obtained through interrogation" and confessions. The record reflects that appellant volunteered his confession, and that the resulting statements were not obtained by interrogation. Appellant had no Fifth Amendment right to counsel while giving a voluntary confession that was not the product of custodial interrogation.

Moreover, appellant's Sixth Amendment right to counsel had not yet attached at the time he confessed. "Whatever else it may mean, the right to counsel granted by the Sixth and Fourteenth Amendments means at least that a person is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him —'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), quoting *Kirby v. Illinois,* 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972).

■ Assuming that a right to counsel was available to appellant the time he confessed, and assuming further that his statement that he would like to ask a legal question (from the context evidently about a car title) invoked his right to counsel, we find that appellant "initiated further communication, exchanges or conversations with the police" when he said "it really doesn't matter" and "took his arm and moved the telephone and phone book back

and said, I'll sign the statement." See *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); see also *Oregon v. Bradshaw*, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983). Furthermore, the record fails to reflect that appellant was interrogated after this supposed invocation of the right to counsel. The record reflects merely that appellant was again warned and thereupon began dictating a narrative account of that night's murders. Therefore, assuming invocation of the right to counsel, there was either a reinitiation or no further interrogation. In either event, there was no violation of *Miranda*, as *Edwards*, supra, makes clear:

> "Had Edwards initiated the meeting [on the day following his invocation of the right to counsel], nothing in the Fifth and Fourteenth Amendments would prohibit the police from merely listening to his voluntary, volunteered statements and using them against him at the trial. The Fifth Amendment right identified in *Miranda* is the right to have counsel present at any custodial interrogation. Absent such interrogation, there would have been no infringement of the right that Edwards invoked and there would be no occasion to determine whether there had been a valid waiver."

Ground of error number five is overruled.

Appellant's seventh, eighth, ninth, tenth, and eleventh grounds of error concern the admissibility of a transcript of testimony from an earlier trial. An understanding of the issues surrounding the transcribed testimony requires a brief digression into the history of this case.

Appellant committed the offense in October, 1974, and was indicted in February, 1975. Two attorneys were appointed to represent him. Over defense objection, Dr. John Holbrook, a psychiatrist, testified at the guilt-innocence phase of the trial on the issue of appellant's sanity at the time of the offense. Appellant was found guilty and death was assessed as punishment. This court affirmed the conviction, *Granviel v. State*, 552 S.W.2d 107 (Tex.Cr.App. 1976), cert. denied 431 U.S. 933, 97 S.Ct.

2642, 53 L.Ed.2d 250 (1977), and denied habeas corpus relief, *Ex parte Granviel*, 561 S.W.2d 503 (Tex.Cr.App.1978). On appeal from denial of writ of habeas corpus in federal district court, the Fifth Circuit granted habeas relief for *Witherspoon* error. *Granviel v. Estelle*, 655 F.2d 673 (1981).

Appellant was tried again in 1983. This appeal is from the conviction at that trial. Dr. Holbrook died before the second trial was held. During the guilt-innocence phase at the second trial, the State offered a transcript of Dr. Holbrook's testimony to rebut defense evidence of appellant's insanity at the time of the offense. The trial court admitted the transcript over appellant's objections.

Appellant contends that the court erred in admitting Dr. Holbrook's testimony because it was protected by the attorney-client privilege. Appellant raised the same issue on appeal from the first trial, and this Court rejected his contention. See *Granviel v. State*, supra. Under the doctrine of "the law of the case", where determinations as to questions of law have already been made on a prior appeal to a court of last resort, those determinations will be held to govern the case throughout all of its subsequent stages, including a retrial and a subsequent appeal. *Ex parte Calvin*, 689 S.W.2d 460 (Tex.Cr.App.1985); cf. *Willis v. State*, 479 S.W.2d 303 (Tex.Cr. App.1972). Ground of error number nine is overruled.

Appellant contends that the court erred in admitting the testimony because—according to appellant—Dr. Holbrook based his opinion, in part, on the results of tests conducted by Dr. Jerold May. Dr. May's tests were not shown to have been conducted under Dr. Holbrook's supervision or control. Relying on *Lopez v. State*, 628 S.W.2d 77 (Tex.Cr.App.1982), appellant argues that Dr. Holbrook's testimony should have been excluded.

Dr. Holbrook testified that he examined appellant on two occasions. Defense counsel then questioned Dr. Holbrook as follows:

"Q. The conclusions you reached and your opinion of Kenneth Granviel *was based upon information that you received from him while talking to him on those two occasions, was it not?*

"A. *That's correct.*" [emphasis ours.]

Dr. Holbrook's only testimony about Dr. May's testing of appellant was as follows:

"Q. [Prosecutor] At that time, Dr. Holbrook, had you requested that any psychologists make any tests on Granviel?

"A. Yes. At the conclusion of examination I asked Mr. Dickens [Defense counsel] if he could have some psychological testing done and recommended Howard Patterson over here. I think he decided he couldn't do it and somebody else did it, so I don't know who the tester is here.

"Q. Were you at any time furnished with the results of any psychological testing that were done on Kenneth Granviel?

"A. Yes, I was.

"Q. And whose report was furnished to you?

"A. You mean the name of the psychologist?

"Q. Yes.

"A. I think he signed it. Jerold May, PhD."

. . .

"Q. In that respect [whether an antisocial personality is a psychosis or major mental disorder], do you disagree with the conclusions reached by Dr. Jerold May in his report to you, sir?

"A. Well, I think the conclusions in this report vary. If we are talking about his final conclusions, I think I would disagree with the diagnosis, yes."

At no point does Dr. Holbrook's testimony reflect that he based his opinion in part on the results of Dr. May's tests, as alleged by appellant. Ground of error number seven is overruled.

■ Appellant next contends that, because Dr. Holbrook did not give him the *Miranda* warning before the two examinations, Dr. Holbrook's conclusions based on those examinations are inadmissible under *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981) and *Ex parte Demouchette*, 633 S.W.2d 879 (Tex.Cr.App. 1982). Appellant's Fifth Amendment privilege not to be compelled to be a witness against himself was not violated by the absence of *Miranda* warnings before appellant's two interviews with Dr. Holbrook because appellant's responses during those interviews were not compelled. The record reflects that defense counsel sought out Dr. Holbrook and requested that he examine appellant for competency to stand trial and sanity at the time of the offense. Moreover, Dr. Holbrook testified that both defense counsel were present during his first interview with appellant, one defense counsel was present during the second, and that no one else was present during either. On these facts, we find that *Miranda* warnings were not required because Dr. Holbrook's interviews with appellant were not instances of "in-custody interrogation . . . contain[ing] inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Miranda v. Arizona,* supra; see also *Estelle v. Smith,* supra, 451 U.S. at 466–470, 101 S.Ct. at 1874–1876.

The eighth ground of error is overruled.

In a related ground of error, appellant contends that the trial court erred in refusing to instruct the jury at the punishment phase that it could not use the testimony of Dr. Holbrook for any purpose. Appellant argues, again, that because his statements to Dr. Holbrook were unwarned, Dr. Holbrook's conclusions based on those statements were inadmissible for all purposes. Appellant concludes that it was error for the trial court not to instruct the jury to ignore Dr. Holbrook's testimony. Because of our disposition of the previous ground of error, we find no merit in

appellant's argument. The tenth ground of error is overruled.

Because Dr. Holbrook was not available as a witness at the second trial, appellant contends that the trial court's admission of the transcribed testimony denied him his constitutional right to confront and cross-examine the witnesses against him. The record reflects that appellant was represented by counsel at the first trial, and that counsel cross-examined Dr. Holbrook. The transcript of testimony admitted at the second trial included the cross-examination. Appellant's constitutional right of confrontation and cross-examination was not violated by admission of the transcribed testimony at the second trial: "The substance of the constitutional protection is preserved to the prisoner in the advantage he has once had of seeing the witness face to face, and of subjecting him to the ordeal of a cross-examination." *Mattox v. United States*, 156 U.S. 237, 15 S.Ct. 337, 39 L.Ed. 409 (1895); see also *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), and *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980).

Appellant's twelfth ground of error alleges that the trial court erred in admitting the testimony of Dr. Vernon Groves because the warnings required by *Estelle v. Smith*, supra, were not given. Appellant's argument of this ground of error consists of the following:

"Dr. Groves examined appellant when he was released from Gatesville. He also did not warn Appellant of his right to remain silent. ... Appellant's requested limiting instruction to exclude consideration of Holbrook's and of Grove's [sic] testimony was denied."

Appellant has not cited any place in the record where may be found an objection to Dr. Groves's testimony on the ground he now complains of. We have examined the record of Dr. Groves's testimony. The record fails to reflect any objection to its admissibility on the ground appellant adduces on appeal. (Appellant's second trial was held after the decision in *Estelle v.*

*Smith*, supra, had been rendered.) Appellant's twelfth ground of error is overruled.

In his sixth ground of error, appellant contends that "the court erred in denying appellant's motion to dismiss [the instant indictment] because the court was obliged to find the State not ready on the other indictments arising out of that single transaction." The record reflects that, before trial, appellant filed a motion to set aside and dismiss the indictment, envoking Art. 32A.02, V.A.C.C.P. and the Sixth and Fourteenth Amendments. The trial court held a hearing and denied the motion.

As pointed out above, the Fifth Circuit granted appellant habeas corpus relief from his original conviction. The record reflects that the State then petitioned for writ of certiorari in the Supreme Court. The Court denied the petition. The record contains the subsequent order of the Federal District Court conditionally granting the writ of habeas corpus. The order is dated June 26, 1982.

The record reflects that appellant's motion to dismiss was filed July 8, 1982. The trial court heard and denied the motion on August 10, 1982.

Article 32A.02, supra, provides in pertinent part:

"Sec. 1. A court shall grant a motion to set aside an indictment, information, or complaint if the state is not ready for trial within:

"(1) 120 days of the commencement of a criminal action if the defendant is accused of a felony;

"Sec. 2. ...

"(b) If a defendant is to be retried following a mistrial, an order granting a new trial, or an appeal or collateral attack, a criminal action commences for purposes of this article on the date of the mistrial, the order granting a new trial, or the remand."

We find that the instant action commenced for purposes of the Speedy Trial Act on June 26, 1982, the date the Federal court granted the writ and put the State to the choice of releasing appellant or re-

trying him. Appellant filed his motion to dismiss on July 8, 1982, well within the 120 day time period. When an accused files a motion to dismiss under the Speedy Trial Act, *before* the applicable time period has expired, based on the State's failure to announce ready for trial *within* the applicable time period, the motion is premature and should be denied. See *Johnson v. State,* 649 S.W.2d 111 (Tex.App.—San Antonio [4th dist.] 1983), aff'd 662 S.W.2d 368 (Tex.Cr.App.1984); see also *McGee v. State,* 629 S.W.2d 182 (Tex.App.—Waco [10th dist.] 1982).

█ Appellant also claims that his constitutional right to a speedy trial has been violated. Issues arising under our Speedy Trial Act are distinct from issues arising under the constitutional guarantee of a speedy trial. Yoking such distinct claims in one ground of error renders the ground of error multifarious. Nevertheless, we have reviewed appellant's claim under the Sixth and Fourteenth Amendments and find it to be without merit. Appellant argues that, because the State has not tried him or announced ready for trial on any of the other indictments arising out of the same transaction as the instant cause, the other indictments should have been dismissed and prosecution under them barred. Therefore, appellant concludes, prosecution of the instant case should also be barred. There is no rule of "transactional bar" in the constitutional speedy trial guarantee. The sixth ground of error is overruled.

█ In his first, second, and third grounds of error appellant contends that the trial court erred in sustaining the State's challenge for cause against three veniremen, in violation of *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Appellant argues that "unless a venireman states *UNAMBIG-UOUSLY* that he or she would automatically vote against the imposition of capital punishment NO MATTER WHAT THE TRIAL MIGHT REVEAL, it simply cannot be assumed that that is the juror's position. [citing Witherspoon, supra.]" [appellant's emphasis].

In *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the Court wrote:

"The standard [for constitutionally permissible exclusion for cause] is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' [quoting *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980) ]. We note that in addition to dispensing with Witherspoon's reference to 'automatic' decision-making, this standard likewise does not require that a juror's bias be proved with 'unmistakable clarity.' This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear'; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. For reasons that will be developed more fully infra, this is why deference must be paid to the trial judge who sees and hears the juror."

See also, *Lockhart v. McCree,* —— U.S. ——, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986) ("It is important to remember that not all who oppose the death penalty are subject to removal for cause in capital cases; those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases *so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law."* [our emphasis].)

The pertinent portions of each venireman's testimony are set out in the footnote.[2] We find that in each instance the venireman's testimony reflects an adequate

2.

[Mrs. Copeland]

"Q. Okay. I suppose that would be a pretty traumatic experience in your life and would get you to soul-searching—

"A. Yes.

"Q. —pretty thoroughly.

"Is—am I to understand you, then, that—that no matter what the facts were, might be presented to you as a juror, that because of your feelings against the death penalty you would automatically vote against that death penalty in any case 'cause you just personally couldn't do it? Couldn't vote to assess the death penalty?

"A. I don't believe I could.

" . . .

"Q. [Prosecutor] I would like to ask you now: Do you have any conscientious, religious or moral objections to the infliction of the death penalty as a punishment for crime in a proper case, and by proper case I mean one where the law provides for it and the facts justify it?

"A. Yes, I do. I believe it's wrong.

"Q. Is that an opinion, Mrs. Copeland, that you have had for some time?

"A. No, I have just recently came to this decision after my brother's death.

"Q. As the judge stated to you yesterday, you're perfectly entitled to your opinion that—as to any law that you might be called upon to follow in any case and if your objections are such that you just could not do it and you—you would be placed in a horrible position of taking an oath to do something that your conscience wouldn't let you do, well, then, now, I think, is the time to tell us.

"A. I could never say that the man should be killed.

"Q. Okay, and of course, I'm not asking you about this case only, but cases in general, and am I to understand you, then, that—that you could not vote so that the death penalty would be involved, no matter what facts might be presented to you?

"A. I couldn't.

"Q. Okay. Is that a very firm opinion that you have, Mrs. Copeland?

"A. Unless something happens to change my mind, yes.

"Q. Okay. Right now can you think of anything that would change your mind?

"A. I don't—no, I can't.

" . . .

[By the Court:]

"Q. Mrs. Copeland, there's a matter that we need to clear up at this point.

"You have told Mr. Wilson in response to his questions by the State in essence that your feeling about the death penalty is such that you could never serve on a jury in which you could vote for the imposition of the death penalty in any case, regardless of what the facts are; right?

"A. I'm sorry. I'm getting confused now.

"Q. Okay. I'm trying to unconfuse you.

"You have told Mr. Wilson that you have a very strong feeling in opposition to the death penalty in any criminal case?

"A. Yes.

"Q. That your feeling is so strong in that regard that you could not serve on a jury and vote in such a manner that the death penalty would be imposed as a juror, regardless of what the facts are; right?

"A. Right.

"Q. Okay. You have now told Mr. Beatty that you could answer those two or three questions in the penalty phase of a capital murder case yes if the evidence said that you should answer them yes?

"A. This was if I was on the jury.

"Q. Okay.

"A. I—

"Q. Uh-huh. All right. Go ahead.

"A. Did I just cross my answers?

"Q. You sure did.

"We need—you have told the State you cannot and told the defense you can, and all we need to know is which way it is?

"A. Okay. If I was on, which I know—I could never say that he should die, whoever, but I could listen—this is where I thought the questions were coming from. I thought I could listen to the evidence and answer these questions yes, but when it came to the point of saying I thought he should die, I can't.

"Q. Okay. Then what in essence you're telling us is maybe that you could serve on a jury and if the evidence showed those answers should be yes, you could vote yes knowing that I would be the person that said he would die; is that how it goes?

"A. Yes.

"Q. That's the way it works. The judge assesses the death penalty.

"A. Yes.

"Q. But the jury tells him to assess the death penalty, so all we need to know is—is how you feel?

"A. No.

"Q. No what?

"A. Because then I would still be saying that he should die.

"Q. Yes. You and 11 others would if that were the situation, uh-huh. If the answers are yes, if all the answers are yes, then the judge is going to impose the death penalty; if any one of them is no, then the judge is going to impose the life sentence. See?

"A. Right.

"Q. Okay. Now, I think we're finally getting down to this point and it's a point of procedure of how it's gone about.

"All right?

"A. Uh-huh.

"Q. Does it make a great deal of difference to you in your feeling about the imposition of

a death penalty in a criminal case whether the foreman of the jury writes out life or death or whether the foreman of the jury writes down yes three times ... Has the same effect, doesn't it?

"A. (nods).

"I can't do it.

"Q. Under any circumstances?

"A. No sir.

"Q. All right.

"That's fine, Mrs. Copeland. That's all we need to know, you know, is how you feel about it and—and that is entirely your business, but we sure do need to know it.

"Now, are you firm in that conviction?

"A. Yes.

"Q. Would it be a fair statement to say that you are so unalterably opposed to the imposition of a death sentence that you would never vote for it, regardless of what the facts showed?

"A. Well, as I told Mr. Wilson, unless something happened to change my mind.

"Q. Okay.

"A. I have no idea what could change my mind, but—

"Q. Well, of course, we can't go into that and—and actually the law requires the inquiry to be made as of right now, so I take it your answer is as of right now?

"A. Is no.

"Q. Okay. All right.

"Okay. That's what we needed to know. Thank you, Mrs. Copeland.

"THE COURT: State's challenge is sustained."

\* \* \* \* \* \*

[Mr. King]

" . . .

"Q. [Prosecutor Bays] In a proper case, do you have any religious, conscientious or moral objection against death as a punishment for crime?

"A. I do.

"Q. Could you tell us how you formed this opinion, sir?

"A. I think it would just be devastating to my conscience. I guess I'm going through a spiritual organization or reorganization and I just don't think I could do it.

"Q. Well, are you saying you wouldn't want to do it or you couldn't do it?

"A. I couldn't do it.

"Q. You couldn't do it?

"Is this opinion you have—I take it's not something you have held—a view you have held for a number of years?

"A. I have—probably hasn't faced me like this before, but I would, generally would agree with your assumption.

"Q. Well, of course it's—it's one thing to—to be down at your club or on the golf course talking about the death penalty in the abstract and it's quite another thing to be seated up here knowing that you may find yourself with that kind of responsibility.

"A. Yes.

"Q. It—it—it's no longer an abstract concept; it's a very real situation—

"A. Yes.

"Q. —that confronts you.

"Is this—am I to understand that your feelings are the result of your religious experience that you may have had recently?

"A. Yes.

"Q. I see.

"Well, Mr. King, let me ask you this: Is this feeling on your part so firm that—that you would automatically vote against the death penalty regardless of what the facts in the case might show?

"A. Yes.

"Q. Yes?

"A. Yes.

"Q. And I take it that the feeling that you have expressed here is so deep-rooted that—that you couldn't imagine any set of circumstances whatever that would cause you to abandon this feeling you have?

"A. No.

" . . .

"Q. —and what we are seeking here is—and I want to tell you I appreciate your candor on this subject—but we are seeking here a group of people, 12 people who can fairly and impartially listen to all the evidence and fairly consider all of the possible variations of outcomes that may be here, and you're telling this judge, I take it, that you couldn't be a part of the infliction of the death penalty?

"A. Yes.

"Q. You just—you wouldn't want it on your conscience?

"A. That's right.

"Q. All right.

"Now, I'm saying these things for you.

"Could you tell us now, now that you have had a chance to sort through your thoughts, just tell us, if you will, how you feel about the death penalty and why you feel this way?

"A. It's the feeling—it's just my conscience. I think if I had to make that decision I would feel like that I was the one that did it, because it would be left up to me. If all the rest agreed, then I just couldn't have that on my conscience.

" . . .

"A. Well, that's the way I feel, if it meant that I would vote for the death penalty, I wouldn't take the oath.

"Q. All right.

"Let me—let me ask you about—suppose you found yourself on the jury, suppose we go over the oath question for a minute and you actually do find yourself on the jury and as distinguished a gentlemen as you are, I'm sure you would be a good candidate for foreman of the jury.

"Could you sign a verdict—knowing it to be a true verdict, could you sign the verdict form as the foreman knowing once again that your signature on that document and the doc-

uments returned to the judge would necessarily cause the death penalty to be imposed?

"A. No, I couldn't.

\* \* \* \* \* \*

[Reverend Curry]

"Q. [Prosecutor Bays] Let ask if you have any religious, conscientious or moral objections to the imposition of the death penalty as a punishment for crime?

"A. I do.

"Q. All right.

"Have you held this view for some time, sir?

"A. Yes. Prior to even going into the ministry I did.

"...

"A. I don't believe that any man has the right to sit in righteous judgment on another.

"Q. Righteous judgment? Being—

"A. Determining whether he should live or die.

"Q. That is—is there difference, then, between judgment and righteous judgment?

"A. Yes.

"...

"Q. Okay. Now, Reverend Curry, is this feeling you have, you have had it now for four—four years, I suppose. Is this feeling on your part so firm that you would automatically vote against the death penalty, regardless of what the facts might show in the case?

"A. Irregardless.

"Q. ...

"Now, earlier you said that your opinions about the death penalty were so firm that you would automatically vote against the death penalty regardless of the facts of the case?

"A. Irregardless.

"Q. All right.

"Now, is what you're telling the judge, then, that even if you were convinced beyond a reasonable doubt, for example, that the defendant acted deliberately and there was a reasonable expectation that his actions would result in the death of another, that you might answer no to that question when in fact in your heart you knew the answer was yes?

"A. Oh, no, I wouldn't do that. I wouldn't lie about it.

"Q. All right.

"Well, this is—you would answer the question truthfully?

"A. Truthfully, that's right.

"Q. All right.

"Now, the second question is—we're talking about whether there's a probability he would commit criminal acts of violence?

"A. Uh-huh.

"Q. All right.

"Let's assume the situation where you had been convinced beyond a reasonable doubt, whatever evidence is required to show you that proposition is true, and you know, there are some people in our society that continue to commit crimes day after day after day.

"If you were convinced of that beyond a reasonable doubt, could you answer yes to that knowing that you have already answered yes to the first question and knowing that the two yes answers just—

"A. Two yes answers would give him—

"Q. —give him the death penalty?

"A. —death penalty.

"Q. Could you do that?

"A. I would answer it truthfully if I was on the jury, yes.

"Q. You could do that?

"A. Yes.

"Q. All right.

"Now, here is the—the oath that you'll have to take as a juror. You see it over here? It's closer to me. It's on the larger card?

"A. Uh-huh.

"Q. And what that oath says is that you will a true verdict render according to the law and the evidence, so help you God?

"A. That's right.

"Q. Okay, so if you take that oath, then you're telling—I guess that you are telling us now is that even though you're—you're adamant in your opposition of the death penalty, if you take an oath to render a true verdict, then you will render a true verdict and it won't matter to you whether death results or not?

"A. Oh, it matters. That's why I don't want to be a part of it, to be placed in that position.

"Q. Well, Reverend Curry, you can see why this process takes a while, but we just, you know, this is the one and only opportunity we're ever going to have to talk to you, okay?

"A. Okay.

"Q. If I understand what you are saying, then, is you just don't want to be a part of this because of the feelings you have about the death penalty?

"A. That's right. I'm liable to be put in the position by telling the truth of what I have heard and what I understand that would transpire as a juror would place me in this position that I couldn't—I would have to go against what I believe, staunchly believe in, and that I would demand then that he be given capital punishment and whatever you said it was, an injection or something, lethal injection, and I don't want to be placed in that position.

"Q. Well—

"A. Because I will not lie about it.

"Q. All right.

"Well, now, you know, no one can—can force you to take an oath as a juror?

"A. I know.

"Q. Are you telling the Court, then, that you would not take the oath as a juror?

"A. Oh, no. I can take—as long as it's before a magistrate I can take an oath.

"Q. All right, but once—

"A. I have already taken two.

"Q. But once—but we're talking about the oath that says you'll give a true verdict in a death penalty case?

basis upon which to conclude that the prospective juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. The first, second, and third grounds of error are overruled.

 In his fourth ground of error, appellant contends that "the trial court erred in administering the oath required under article [sic] 12.31(b) of the Texas Penal Code as such oath prevented the jurors from exercising their discretion and considering all the mitigating evidence in considering whether to assess the death penalty." Section 12.31(b) provides as follows:

"Prospective jurors shall be informed that a sentence of life imprisonment or death is mandatory on conviction of a capital felony. A prospective juror shall be disqualified from serving as a juror unless he states under oath that the mandatory penalty of death or imprisonment for life will not affect his deliberations on any issue of fact."

Appellant argues as follows:

"Although the State has stopped questioning jurors about the oath required under 12.31(b) and therefore no one is excused for failure to take the oath (because they are not told they can avoid taking the oath), the harm attendant to administering the oath is still present. It does not make much sense to prevent some one from being excused for failure to take the oath because to do so would deprive the accused of a fair and impartial jury but then to allow the trial court to require the jury swear an oath not to let the imposition of the death penalty affect their deliberations. The oath not only violates the spirit of *Adams v. Tex-*

---

"A. That's right. If I took that oath that's what I would do.

"Q. All right.

"Would you take the oath becomes the question?

"A. No, because it's going to place me in an uncompromising position.

"MR. HILL: Your Honor, we'll raise the same objection we raised earlier regarding the Motion in Limine Three.

"THE COURT: Overruled.

"BY MR. BAYS:

"Q. You would refuse to take the oath?

"A. If it's going to place me in a position that I can't get out of—that would make me go against my own conscience.

" . . .

"Q. Now, at that time what I'm asking is: knowing the State of Texas and knowing what can happen and knowing your own feelings about the death penalty, will you or will you not take the oath?

"A. Not if it's going to put me in that position.

"MR. HILL: We're going to object to the— on the same grounds we have before. Mr. Bays by that question is attempting to expand the requirements or the qualifications of the juror and we object.

"THE COURT: Overruled.

"BY MR. BAYS:

"Q. And your answer is not if it will place you in a position—

"A. That it's going to make me have to make a decision whether the man lives or dies.

" . . .

"Q. And based upon that question you're taking the position that rather than you be placed

in the position of having to either set aside your personal conviction or not, you would choose not to take that oath?

"A. That's right, because I don't want to be put in that position, 'cause I'm not going to set them aside irregardless.

" . . .

[THE COURT]

"Now, had you been selected to serve as a juror in the trial of a capital murder case, in the event you had been selected to serve in that capacity, you have told us that you have a very strong and very severe feeling of principle against the infliction of the death penalty under any circumstances, regardless of what they might be?

"A. That's right.

"Q. All right.

"The question, then, becomes if you were serving on a jury which were to determine those questions and that matter—

"A. Uh-huh.

"Q. —all I need to know at this point is how strong is that feeling, Reverend? Would you always vote against death or are there circumstances under which you could vote for it if the evidence shows you you should?

"A. Irregardless I will not change my position, that I will not want to be in a position to have to decide whether a man would live or die.

"Q. All right.

"A. And I would vote that he live irregardless to whether the evidence was presented.

"Q. Every time?

"A. Every time.

"Q. Okay."

*as,* supra, but also violates the tenets of *Edmund [sic] v. Florida,* supra, [458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140] in that it forces the jury to swear not to consider [sc. allow?] their feelings about the death penalty to affect their deliberations nor does the oath allow the jurors to consider mitigating evidence in determining whether to answer the questions yes or no. By giving the oath, the trial court has forced the jury to consider only the evidence which goes directly to the answering of the questions and to ignore the juror's feelings and arguments against the death penalty."

In *Adams v. Texas,* supra, the Supreme Court held that exclusion of members of the venire from jury service because they are unable to take the oath of Sec. 12.31(b), supra, violates the Sixth and Fourteenth Amendments as construed and applied in *Witherspoon v. Illinois,* supra. Appellant does not claim that members of the venire were excluded from jury service because they were unable to take the oath of Sec. 12.31(b).

Appellant does not claim nor does the record reflect that any juror balked at or expressed reservations about taking the oath. Appellant does not claim nor does the record reflect that any prospective juror was told that he would not be allowed to serve if he did not take the oath. Appellant did not ask the trial court to inform the prospective jurors that they could not be excluded from service for their inability or unwillingness to take the oath. The record reflects that after the jury was chosen from the venire, but before the members were sworn, appellant objected outside the jury's presence to the administration of the oath on the ground that administration of the oath violates *Adams* and *Witherspoon.*

That the State may not exclude from service persons who cannot or will not take the oath does not imply that persons who can and do take the oath may not serve on a capital jury, or that a jury composed solely of persons who have taken the oath is constitutionally impermissible. *Adams* does not require that a capital jury be composed of persons whose deliberations on issues of fact *will* be affected by the mandatory penalties; rather the case holds that such persons may not, without more, be excluded from service on the jury. Cf. *Lockhart v. McCree,* supra. Because the prospective jurors in the instant case were not required to take the oath as a condition of service on the jury, the operation of the statute and administration of the oath in this case did not violate the holdings of *Adams* and *Witherspoon.* See also *Milton v. Procunier,* 744 F.2d 1091 (5th Cir.1984); *Brooks v. Estelle,* 697 F.2d 586 (5th Cir. 1982).

 If we understand him correctly, appellant claims further that the oath unconstitutionally denies jurors the freedom to deliberate and decide issues of fact in a capital case in light of their feelings toward the death penalty as a general issue, and arguments against the death penalty on policy grounds. In other words, appellant claims that jurors must be allowed to find the facts as a means toward accomplishing the result the juror thinks just; that is, according to the juror's belief whether this or any defendant should suffer penalty of death.

Perhaps jurors sometimes do subordinate the facts to the result they wish to reach. That is not the issue, however. Appellant claims that the Constitution *prohibits any* restraint on a juror's power to deliberate and find the facts according to his feelings about the death penalty. That contention runs contrary to the predicate of *Witherspoon v. Illinois,* supra, and *Wainwright v. Witt,* supra. What are those cases about, if not the extent of the State's power to remove prospective jurors who will not "temporarily set aside their own beliefs in deference to the rule of law" (*Lockhart v. McCree,* supra)?

Moreover, the oath does not prohibit jurors from considering all mitigating factors in arriving at answers to the special issues at the punishment phase. Appellant mistakes considerations of the justice or wisdom of the death penalty for mitigating factors. The catalog of possible mitigating circumstances found in such cases as *Jurek v. State,* 522 S.W.2d 934 (Tex.Cr.App.1975),

aff'd 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976) does not support appellant's view of "the juror's feelings and arguments against the death penalty" as mitigating factors.

The fourth ground of error is overruled.

■ In his eighteenth ground of error, appellant claims the trial court erred in denying his offer of certain testimony at the punishment phase. The record reflects that appellant offered testimony to show the death penalty's lack of deterrent effect. The State "moved to quash" the testimony and the court granted the motion. Appellant reoffered the testimony for "the jury's consideration in mitigation of punishment." The court denied the offer. Article 37.-071(a), V.A.C.C.P. provides, in part, that at the punishment phase, "evidence may be presented as to any matter that the court deems relevant to sentence." We will not repeat our discussion of the previous ground of error. It must suffice here to say that evidence about the effectiveness of the death penalty as an instrument of social policy is simply not relevant to the special issues of a capital punishment proceeding.[3] There was no abuse of discretion in denying the offer of evidence.

Appellant claims in his brief that he called the witness "to rebut the State's contention that the death penalty acts as a deterrent to others who would commit capital murder." Assuming, arguendo, that the evidence would be admissible in rebuttal of such a claim, appellant does not point out where the State made this contention to the jury. Moreover, appellant offered the testimony in mitigation, and not in rebuttal of some contention by the State.

Appellant relies also on *Powell v. State*, 631 S.W.2d 169 (Tex.Cr.App.1982) and *Campbell v. State*, 685 S.W.2d 23 (Tex.Cr. App.1985). In those two cases the convictions were reversed for the trial court's refusal to allow defense counsel to question the venire on rationales of punishment. Appellant concludes that "the purpose of punishment is a legitimate consideration of the jury." *Powell* and *Campbell* are inapposite here. Neither was a capital case. The role of a capital jury at the punishment phase is much more narrowly circumscribed than that of ordinary felony juries. The jury in a capital case sits solely for the purpose of answering the special issues. The legislature has determined what punishment must be assessed, according to the answers given. A capital jury does not have the authority to arrive at or alter its answers to the special issues on the ground that *it* believes that the "purpose of punishment" will not be served by imposition of the death penalty on the defendant. The eighteenth ground of error is overruled.

■ In three grounds of error appellant complains of the testimony of two court bailiffs. The record reflects that both bailiffs testified at the punishment phase of the trial. One bailiff testified that he saw appellant, while in private conference with his attorney in a holdover cell, slap the attorney. The other bailiff testified that he saw appellant, while in private conference with his attorney, grab the attorney by the coat or tie. Appellant claims that these acts were communications protected by the attorney-client privilege, and that permitting the bailiffs to testify to these matters deprived him of the effective assistance of counsel. We find that, on the facts of this case, appellant's acts of slapping and grabbing his attorney do not constitute communications protected by the attorney-client privilege. Grounds of error sixteen and seventeen are overruled.

Appellant argues that the bailiffs were not competent to testify, as follows:

> "It has been held that the Court's bailiffs becomes [sic] an extension of the court when that bailiff attends the jury. As such, he is cloaked with the credibility of the Court and is not, therefore, a competent witness. This is true in part because he has had the opportunity to gain the confidence of the jurors by his constant association with them."

---

**3.** In approving the death penalty scheme of our statute the Supreme Court stated in *Jurek* that "the Texas capital-sentencing procedure guides and focuses the jury's objective consideration of the particularized circumstances of the *individual offense* and the *individual offender* before it can impose a sentence of death." [our emphasis.]

Appellant cites no authority for the proposition he advances. Nevertheless, assuming it was error to admit the testimony of the two bailiffs, we find the error was harmless. The jury had heard evidence that in October 1974 appellant had raped a woman, and then killed her, together with two other women and two children, by stabbing them. The jury heard evidence that in February 1975, appellant killed a fourth woman by stabbing her, then raped a fifth woman and killed her by stabbing her and striking her in the head with a hammer. The same night as the latter two murders, appellant raped another woman twice and threatened yet another woman and her two young children with a handgun. In light of the foregoing evidence, we find the admission of the bailiffs' testimony that appellant slapped and grabbed his lawyers to be harmless error beyond a reasonable doubt. Ground of error fifteen is overruled.

In his fourteenth ground of error appellant contends that the trial court erred in not applying the law to the facts of the aggravating offense of aggravated rape. Appellant timely objected to the charge on this ground. The record reflects that the court instructed in the abstract on the elements of the offense of aggravated rape. The paragraph applying the law to the facts reads as follows:

"Now bearing in mind the foregoing instructions, if you believe from the evidence beyond a reasonable doubt that on or about the 7th day of October, 1974, in the County of Tarrant and State of Texas, as alleged in Count One of the indictment, the defendant, Kenneth Granviel, did then and there intentionally cause the death of an individual, Natasha McClendon, by cutting her with a knife, while in the course of committing or attempting to commit aggravated rape (as hereinabove defined) of Laura McClendon, you will find the defendant guilty of the offense of capital murder and so say by your verdict; but if you do not so believe, or if you have a reasonable doubt thereof, you will acquit the defendant of the offense of capital murder...."

We have stated that the elements of the aggravating offense need not be set out in that portion of the charge applying the law to the facts of the case. *Garrett v. State*, 682 S.W.2d 301 (Tex.Cr.App.1984). We find no error in the charge in the instant case. The fourteenth ground of error is overruled.

The judgment of the trial court is affirmed.

ONION, P.J., not participating.

CLINTON, Judge, dissenting.

The majority performs a disservice to all concerned in its entirely summary treatment of appellant's grounds of error one, two, and three. To simply quote at length the Supreme Court of the United States, then to drop a great mass of raw transcript into the margin and perform absolutely no analysis is to refuse to perform the appellate function of this Court. Such conclusory treatment is especially inappropriate in a case in which the death penalty has been assessed.

Specifically, I dissent to the majority's disposition of ground of error three, regarding the exclusion for cause of venireman Edgar Lincoln Curry. Reverend Curry, an ordained minister, admittedly voiced strong religious and moral objections to the death penalty. When asked by the prosecutor if these objections were so strong that he "would automatically vote against the death penalty, regardless of what the facts might show in the case?" Curry responded, "Irregardless."

This question and answer, however, are not dispositive. In Texas jurors do not "vote for" or "vote against" imposition of the death penalty. The question is not how the venireman might vote in a popular referendum concerning capital punishment, but whether he can set aside his personal feelings and truthfully answer the special issues of Art. 37.071, V.A.C.C.P., based on the law and the evidence of the particular case. Rev. Curry stated that he could do so:

Q. [by the prosecutor] Let's assume the situation where you had been convinced beyond a reasonable doubt, what-

ever evidence is required to show you that proposition is true [the probability of appellant's committing criminal acts of violence in the future], and, you know, there are some people in our society that continue to commit crimes day after day after day.

If you were convinced of that beyond a reasonable doubt, could you answer yes to that knowing that you have already answered yes to the first question and knowing that the two yes answers just—

A. Two yes answers would give him—

Q. —give him the death penalty?

A. —death penalty.

Q. Could you do that?

A. I would answer it truthfully if I was on the jury, yes.

Q. You could do that?

A. Yes.

The prospective juror continued to insist on his opposition to the death penalty in general, yet also continued to insist that he would truthfully answer the special issues based on the law and the evidence. He was clearly the type of juror who could not be excluded for cause, one who has scruples against the death penalty and yet will follow the law. *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). It was only when the prosecutor suggested that the venireman could escape the troublesome duty of serving on the jury in this capital case by refusing to take the oath required of jurors, Art. 35.22, V.A.C.C.P., that Curry stated he would not take the oath. Appellant specifically objected to the State's making this suggestion. The objection was overruled.

I dissent to this method of excluding a pefectly qualified juror, for the reasons elaborated in my dissenting opinion in *Ellis v. State*, 726 S.W.2d 39 (Tex.Cr.App., this day decided).

I also write to point out that there is no ambiguity to be resolved in Curry's responses. He was not an equivocating juror. Every time he was asked the relevant questions regarding his ability to serve as a juror he responded that he would answer the special issues based on the law and the evidence. It was only when the trial court in the final round of questioning again reverted to the "vote against" questions that appellant stated he would not follow the evidence:

Q. —all I need to know at this point is how strong is that feeling, Reverend? Would you always vote against death or are there circumstances under which you could vote for it if the evidence shows you should?

A. Irregardless I will not change my position, that I will not want to be in a position to have to decide whether a man would live or die.

Q. All right.

A. And I would vote that he live irregardless to whether the evidence was presented.

Q. Every time?

A. Every time.

This was not equivocation. Every time he was asked in the abstract whether he would "vote against death" the venireman responded that he would. Nevertheless, every time he was asked whether he could answer the special issues in the affirmative if the evidence proved that they should be so answered, he responded that he would. It is true that he did not want to be placed in the position of performing this duty and so seized upon the escape offered by the State by saying he would not take the oath. But before he was given that option he stated that he could take an oath to render a true verdict based on the evidence, and would follow it. He was a classic example of the type of juror who, under *Adams*, supra, could set aside his personal feelings and vote based on the law and the evidence in spite of his expresed objection to the death penalty in general. He was thus qualified to serve.

I respectfully dissent.

TEAGUE, J., joins.

ONION, P.J., not participating.